# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 15-1529V
### (not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
JOHN HOMICK and RACHEL HOMICK,      *
Parents and Natural Guardians of Z.H.,   *
a Minor,                            *        Special Master Oler
                                    *
              Petitioners,          *        Filed: June 26, 2018
                                    *
       v.                           *        Attorneys' Fees and Costs;
                                    *        Reasonable Basis.
                                    *
                                    *
SECRETARY OF HEALTH AND             *
HUMAN SERVICES,                     *
                                    *
              Respondent.           *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Jeffrey A. Golvash*, Brennan, Robins & Daley, P.C., Pittsburgh, PA, for Petitioners.

*Sarah C. Duncan*, U.S. Dep't of Justice, Washington, D.C., for Respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On December 16, 2015, John and Rachel Homick ("Petitioners") filed a petition on behalf of their minor child, Z.H., seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioners alleged that Z.H. suffered from a thyroglossal duct cyst ("TDC") as a result of his Haemophilus Influenza Type b ("Hib") vaccination administered

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the ruling will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

on May 1, 2014.[3]  Petition ("Pet."), ECF No. 1.  On May 22, 2017, Petitioners filed a Motion for a Decision Dismissing Petition (ECF No. 26); a decision dismissing the petition for insufficient proof was issued on June 1, 2017.  ECF No. 27.  Judgment was entered on June 22, 2017.  ECF No. 29.

On August 9, 2017, Petitioners filed a Motion for Attorneys' Fees and Costs ("Fees App."). ECF No. 33.  Petitioners request attorneys' fees in the amount of $18,247.50 and costs in the amount of $3,574.84, totaling $21,822.34.  *Id*. at 3-4.  In compliance with General Order No. 9, Petitioners submitted a statement representing that "they did not incur costs related to litigation of this matter."  Fees App., Exhibit ("Ex.") B.  For the reasons set forth herein, Petitioners are awarded $17,242.34.

## I.   Procedural History

As the Fees Application reveals, Petitioners met with Attorney Jeffrey Golvash on September 8, 2014 to "[d]iscuss medical history and vaccine related injury and treatment."  Fees App., Ex. A at 1.  Mr. Golvash requested and reviewed medical records, plus "medical literature regarding thyroglossal duct cyst and resulting infections and causes."  *Id*. at 2.  Mr. Golvash billed 3.8 hours for reviewing that medical literature.  *Id*.  The petition was eventually filed on December 16, 2015.  Pet.  On January 29, 2016, Petitioners filed medical records and a statement of completion.  ECF Nos. 8, 9.

Respondent filed a Rule 4(c) Report ("Resp't's Report") on March 14, 2016, stating that Petitioners did not meet "their *prima facie* burden to show causation-in-fact" and that "this case should be dismissed."  ECF No. 12 at 7.  Specifically, Respondent argued that Petitioners did not present any "reputable scientific or medical theory establishing that the Hib vaccine can cause a thyroglossal duct cyst (general causation) or that it did so in Z.H.'s case (specific causation)."  *Id*. at 5.  Respondent also noted that Petitioners did not provide an expert report to support their claim. *Id*.

Respondent filed medical literature ("Resp't's Ex. A") along with their Rule 4(c) Report, citing information provided by the University of Rochester Medical Center ("URMC") Health Encyclopedia, which states that "children are born with thyroglossal duct cysts that form 'from leftover tissue from the development of the thyroid gland when an embryo was forming.'"  *Id*. at 6 (citing Resp't's Ex. A at 1).  Respondent also quoted information from the URMC Health Encyclopedia, which states that "[a]lthough the cyst is present at birth, it is usually not found until a child is at least age 2.  Often a healthcare provider finds a thyroglossal cyst when a child gets an upper respiratory infection."  *Id*.  Applying the medical literature to the case at hand, Respondent argued that "not only was the cyst a preexisting condition formed in utero, but[]Z.H. also had a URI for at least five days prior to the development of the cyst, and also had been intermittently sick for three weeks prior."  *Id*. at 6.

---

[3] This case was initially assigned to now-retired Special Master Hastings (ECF No. 4), reassigned to Special Master Corcoran on October 5, 2017 (ECF No. 37), and then reassigned to my docket on November 30, 2017 (ECF No. 39).

Respondent noted that Petitioners did not provide reliable scientific or medical evidence to "establish[] that the time between Z.H.'s vaccination and the onset of symptoms the same day (or between the vaccination and his second infection eighteen days later) would be" a medically accepted timeframe to support causation. *Id.* at 6-7. Respondent also pointed out that none of Z.H.'s treating physicians attributed the TDC to the Hib vaccine, rather, "multiple physicians noted that Z.H.'s risk factors included a URI…." *Id.* at 7. (*citing* Ex. 2 at 63-65; Ex. 3 at 6-7; Ex. 4 at 37, 41).

Mr. Golvash reviewed Respondent's report on March 15, 2016 along with the medical literature authored by the URMC Health Encyclopedia. Fees App., Ex. A at 3. Shortly after the submission of Respondent's report, on March 17, 2016, Special Master Hastings issued an order, instructing parties to discuss settlement. ECF No. 14. If settlement was not possible, then Petitioners were instructed to routinely file status reports until Petitioners file an expert report. *Id.*

On March 24, 2016, Mr. Golvash "prepare[d] a narrative request to Dr. Maguire[,]" and followed up with Dr. Maguire on April 29, 2016 regarding the request. Fees App., Ex. A at 3. Petitioners filed a status report on May 3, 2016, informing the Court that the expert report requested from Dr. Maguire, who was identified in the report as Z.H.'s surgeon, was in processing. ECF No. 15.

On June 3, 2016, Mr. Golvash sent a follow up email to Dr. Maguire "regarding [the] narrative request" and had a "[t]elephone call with UPMC legal regarding [the] narrative request." Fees App., Ex. A at 3. A few days later, on June 9, 2016, Mr. Golvash followed up with Petitioners to inform them that Dr. Maguire was "unable to prepare narrative." *Id.* On the same day, Mr. Golvash sent a letter to Dr. Hillman "requesting independent medical record review." *Id.*

On June 14, 2016, Petitioners submitted a status report, informing the Court that Dr. Maguire was "unable to participate in the vaccine injury claim of Z.H." and that Petitioners had "a record review request pending with another ENT physician." ECF No. 16. On the same day, Mr. Golvash followed up with Dr. Hilal and conducted "[a]dditional medical research on infected thyroglossal duct cyst and causes." Fees App., Ex. A at 4. Mr. Golvash also sent a letter to Dr. Hilal, which included Z.H.'s medical records and medical literature. *Id.*

Mr. Golvash followed up with Dr. Hilal on August 23, 2016, and sent an "[e]mail to Dr. Post requesting record review." *Id.* The following day, August 24, 2016, Mr. Golvash and Dr. Post had a telephone call "regarding medical record and causal connection between Hib vaccine and infected thyroglossal duct cyst." *Id.* On September 2, 2016, Mr. Golvash sent a letter to Dr. Post, which included a "summary of [the] claim and enclosing medical records for review." *Id.*

On September 14, 2016, Petitioners filed a status report, stating that "a record review request [was] pending with another ENT physician." ECF No. 19. Mr. Golvash followed up with Dr. Post the following day. Fees App., Ex. A at 4. On October 7, 2016, Mr. Golvash

"[r]eviewed email and summary of medical records from Dr. Post," and on October 13, 2016, he followed up with Dr. Post "regarding record review and narrative." *Id.*

Dr. Post wrote a letter, dated October 28, 2016, to Mr. Golvash regarding causation. Ex. 6. Dr. Post stated the following:

> I have conducted an independent medical review as to the causal connection between the subject vaccine and injury. Additionally, I have conducted an in-depth review of the available medical literature. Unfortunately, I can find no support for a cause and effect relationship, nor can I generate a cohesive medical theory as to why a HiB vaccine would cause an infection of a pre-existing thyroglossal duct cyst.

*Id.* at 1.

Petitioners filed a status report on November 14, 2016, stating that the ENT record review request was completed, but that they were not yet "in receipt of a completed narrative to date." ECF No. 21. The status report further stated that "[a]dditional medical research on the issues of causation is needed" and that, "[a]s an alternative," Petitioners' counsel was "seeking a second opinion from another ENT specialist on the issue of causation." *Id.*

On December 6, 2016, Mr. Golvash followed up with Dr. Post and Dr. Levine "regarding medical record review and causation theory." Fees App., Ex. A at 5. Mr. Golvash also sent letters to both Dr. Bodner and Dr. Levine in order to request a review of the medical record. *Id.* On December 15, 2016, Mr. Golvash sent a letter to Dr. Howell, "requesting record review." *Id.* The following day, December 16, 2016, Mr. Golvash conducted "[a]dditional medical research on Hib vaccine and infected thyroglossal duct cyst." *Id.* On December 20, 2016, Mr. Golvash wrote a letter to Dr. Bhanot "with summary and request for record review." *Id.*

Petitioners submitted a status report on January 9, 2017, stating that "[u]pon review of the medical record and medical literature research," their ENT expert recommended that they "seek the medical opinion of an Infectious Disease Specialist on the issue of causation." ECF No. 22. Petitioners also stated that a request was made to an Infectious Disease Specialist for a review of the medical records. *Id.*

On February 6, 2017, Mr. Golvash followed up with Dr. Bhanot "regarding medical record review and opinion on causal connection between injury and vaccination." Petitioners filed a status report on March 2, 2017, informing the Court that "[p]reliminary review of the medical records by [their] infectious disease expert was inconclusive absent supportive medical literature." ECF No. 23.

On March 14, 2017, Mr. Golvash followed up with a medical research assistant at the University of Pittsburgh Medical Library "regarding summary of [Petitioners'] claim and scope of research requested." Fees App., Ex. A at 5. Mr. Golvash then reviewed medical journal articles that he received from said medical research assistant. *Id.* at 6.

On May 1, 2017, Petitioners filed a status report, informing the Court of their intent to file a motion for a dismissal decision.  ECF No. 24.

On May 22, 2017, Petitioners filed a Motion for a Decision Dismissing Petition.  ECF No. 26.  The motion to dismiss states that "[a]n investigation of the facts and science supporting the case has demonstrated to Petitioners that they will be unable to prove that Z.H. is entitled to compensation in the Vaccine Program."  *Id*.  A decision dismissing the petition was issued on June 1, 2017.  ECF No. 27.  Judgment was entered on June 22, 2017.  ECF No. 29.

Petitioners filed a motion for attorneys' fees and costs on August 9, 2017, Respondent filed a response to such motion on August 23, 2017 ("Resp't's Resp.," ECF No. 34), and Petitioners filed a reply on August 30, 2017 ("Pet'r's Reply," ECF No. 35).  This case was reassigned to Special Master Corcoran (ECF No. 37), and then to me on November 30, 2017 (ECF No. 38).  On January 29, 2018, I issued an order instructing Petitioners to file additional documentation to confirm the hourly rate of Petitioners' expert, Dr. James Christopher Post, as well as his hours expended in this case.  ECF No. 40.  Petitioners filed such documentation on February 7, 2018.  ECF No. 42.

This matter is now ripe for a decision.

## II.     Z.H.'s Medical History

Z.H. was born on October 25, 2011.  Ex. 2 at 33, 52.  Prior to Z.H.'s receipt of the Hib vaccine, Z.H. was seen at Pediatric Alliance, PC ("Pediatric Alliance") for well child visits.  *See generally* Ex. 2.

On October 11, 2012, Z.H. visited Pediatric Alliance for an upper respiratory infection.  *Id*. at 18.  His symptoms of fever, croupy cough, wheezing, and difficulty sleeping, were persistent and began two days prior to his visit.  *Id*.  The record notes that Z.H.'s brother also had a similar illness.  *Id*.  Z.H. had four subsequent well-child visits.  *See generally* Ex. 2 at 4-16.

On June 25, 2013, Z.H. visited Pediatric Alliance with worsening symptoms of an upper respiratory infection, which began one week prior to his visit.  *Id*. at 4.  His next visit at Pediatric Alliance occurred on November 6, 2013, and his neck and thyroid exam was noted to be "supple without lymphadenopathy or enlarged thyroid."  *Id*. at 2.

On May 1, 2014, Z.H. had a well-child visit at Pediatric Alliance, and received the Hib vaccine.  Ex. 5 at 5, 7.  Z.H. was approximately 2 years and 6 months of age at this time.  Examination of his neck and thyroid revealed to be "supple without lymphadenopathy or enlarged thyroid[.]"  *Id*. at 6.

Z.H. presented to University of Pittsburgh Medical Center Passavant ("Passavant") on May 2, 2014, and the chief complaint is noted to be "S/P [status/post] vaccine, swollen neck."  Ex. 3 at 1.  The chief complaint is also documented as "left side neck swelling."  *Id*. at 34.  The "focused

assessment ED" (Emergency Department) states, "pt had immunizations yesterday.  yesterday pt was sleepy.  mother states taht (sic) pt has swelling of left neck.  which has aincreased (sic) after immunizations."  *Id.*

Dr. Conway evaluated Z.H. and provided further detail regarding Z.H.'s condition:

The patient is a 2-year-old male who presents to the emergency department because he has had progressive swelling to the left side of his neck since yesterday.  Incidentally, the patient did have his Hib vaccine yesterday.  However, the child has been having URI symptoms for 1 week and has had a cough that has been worsening and has become productive.  The child has had fevers on and off for over the past week.  He is currently not febrile.

*Id.* at 6.  Physical examination of Z.H.'s neck revealed it to be supple; Dr. Conway further noted, "anterior neck is palpated and he does have what feels like a tender 3 cm left submandibular fullness."  *Id.*  The doctor ordered a CT of the neck.  *Id.* at 7.

Z.H.'s CT scan[4] revealed "a large, probable thyroglossal duct cyst with concern over infection."  *Id.* at 5.  The treating physician (Dr. Conway), whose impression was abscessed thyroglossal duct cyst, discussed the CT results with a doctor (Dr. Iyer) at Children's Hospital of Pittsburgh of the University of Pittsburgh Medical Center ("Children's Hospital"), and the plan was for Z.H. to transfer to Children's Hospital for further treatment.[5]  *Id.*

On May 2, 2014, Z.H. transferred to Children's Hospital.  Ex. 2 at 43.  Provider notes from this visit state:

The patient presents with a swollen neck.  The onset was 12 hours ago. … There are associated symptoms including rhinorrhea and nasal congestion.  The risk factor is recent URI.  … History reported is that child has had a "cold" for the past week for runny nose and cough and low grade fever. … Went to PCP yesterday morning for 2 yr old WCC, and was given Hib vaccine.  Thought he had a resolving URI.  Last evening parents noted a "golf ball" sized growth in the middle of his neck…

*Id.*  Z.H. was prescribed Augmentin and discharged on May 4, 2014 with the following diagnoses: lymphadenopathy, thyroglossal duct cyst, neck mass, and upper respiratory tract infection.  *Id.* at 46-49.

On May 19, 2014, Z.H. visited Children's Hospital's otolaryngology clinic for a follow-up evaluation of his neck mass.  Ex. 4.  The day prior to his visit, he "acutely had worsening of the area in terms of increased size, low grade fevers and minimal apparent tenderness."  *Id.* at 12.  The

---

[4] Radiology report located at Ex. 3 at 19.

[5] Transfer form located at Ex. 3 at 56.

record notes that Z.H. "ha[d] not been sick, but his two siblings have been." *Id*. Z.H. was prescribed antibiotics, and the doctor planned to, after Z.H.'s completion of antibiotics, "schedule excision of midline neck mass and possible Sistrunk procedure in the near future." *Id*. at 13. The doctor also instructed that Z.H. follow up if symptoms continued to worsen. *Id*.

On May 22, 2014, Z.H. visited Children's Hospital's otolaryngology clinic, and Z.H.'s mother informed the doctor that the day prior, Z.H. was "swelling again and it became erythematous and tender….[His mother] noticed a scant amount of drainage from the neck mass, and she brought him in for further management." *Id*. at 25. A needle aspiration abscess and anaerobic culture were ordered and performed. *Id*. at 20-22, 27. Z.H.'s mother called the clinic on May 26, 2014 to obtain the culture results, which "grew beta-lactamase H. Flu." *Id*. at 25. On the lab results themselves, Z.H.'s culture and organism are listed as "Light haemophilus influenzae".[6] Ex. 4 at 51.

On June 4, 2014, Z.H. underwent an excision of midline neck mass at Children's Hospital, which was conducted by Dr. Raymond Maguire. *Id*. at 217. Z.H. was under general anesthesia during the excision procedure. *Id*. The findings of such procedure is noted as "[m]idline neck mass, cystic structure, consistent with thyroglossal duct cyst." *Id*.

Z.H. had a follow up visit on June 13, 2014 at Children's Hospital for "evaluation of post-op[erative] Sistrunk." *Id*. at 395. Z.H.'s mother reported that she "noticed some swelling and firmness of the neck just superior to the incision site." *Id*. The physical examination of Z.H.'s neck reveals that his incision is healing, and that his neck has "mild superior firmness without signs of infection and no drainage." *Id*. at 396. The discharge plan notes that Z.H. is "[h]ealing well" and that Z.H. is to follow up in one month. *Id*. at 397.

On July 25, 2014, Z.H. had a follow up visit at Children's Hospital. *Id*. at 407. The record notes that his "incision is healed well and no signs of recurrence at this time." *Id*. The physical examination revealed the same results as his examination on June 13, 2014. *Id*. at 408.

### III.     The Petition

The petition in this case requests compensation by Petitioners on behalf of their son Z.H. "in connection with the Haemophilus Influenza Type b (Hib) vaccination he received on May 1, 2014, from which he developed thyroglossal duct cyst, which was caused-in-fact by the above-stated vaccination." Pet. at 1. The language in the petition makes it clear that Petitioners allege Z.H.'s TDC was <u>caused</u> by his Hib vaccination. The petition does not allege that Z.H.'s TDC became infected as a result of the Hib vaccine, or that the TDC was substantially aggravated by the vaccine.

In their motion for Attorneys' Fees and Costs, Petitioners present a different description of their initial demand. That motion states, "Petitioners contend in their Petition that Z.H. received

---

[6] The words "non typable" (sic) are hand-written to the right of the test results. There is also a "?" in the margin. *See* Ex. 4 at 51. It was not clear from the record who made these annotations.

the Hib vaccine on May 1, 2014, from which he developed an *infected* thyroglossal duct cyst, which was caused-in-fact by the said Hib vaccination." Fees App. at 1 (emphasis added). The addition of the word "infected" represents a wholesale change to Petitioners' theory of the case. Instead of contending that the Hib vaccine caused Z.H.'s TDC to form (which, based on the record of this case, would have been a difficult theory to establish, given that a TDC is congenital), they now aver that Z.H.'s TDC became infected as a result of the Hib vaccine.

The Guidelines for Practice under the National Vaccine Injury Compensation Program (hereinafter "Guidelines") state that "leave to file an amended petition is routinely granted" "[i]f the evidence unexpectedly turns out to support an alternative theory of proof". Guidelines at 8. Because Petitioners' request to amend the Petition would have been granted had it been made, I will consider both theories in this analysis.

## IV.    Parties' Arguments

In the present motion, Petitioners maintain that despite their "series of extensions to secure an expert report on causation….they were unable to gather sufficient evidence to establish vaccine causation of Z.H.'s injury." Fees App. at 1. Petitioners aver that "a simple pre-filing review of the medical record would evidence [that] Z.H. had an otherwise unremarkable pre-vaccine history but for a few upper respiratory infections (URI)." *Id*. at 2. Petitioners further note that regardless of Z.H.'s prior URIs and pre-existing congenital TDC, "Z.H. had no history of infected thryoglossal duct cyst and/or other resulting URI sequela." *Id*. Petitioners cite to medical records, which show that Z.H. received the Hib vaccine the day before onset of symptoms of his TDC. *See e.g.* Ex. 3 at 1, 6, 34. Petitioners also cite to medical records, which report that his TDC culture grew beta-lactamase h. influenza (*see* Ex. 4 at 25), and they point out that "the Hib vaccine is given to prevent infections caused by *h. influenzae*." Fees App. at 3. Petitioners also, without citing any medical literature, state that "medical literature supports a correlation between infected thryoglossal duct cyst and *h. influenza*." *Id*. In light of the above, it is Petitioners' position that their petition was "filed and prosecuted in good faith and with a reasonable basis." *Id*.

Respondent filed a response to Petitioners' present motion on August 23, 2017. Resp't's Resp. While Respondent has no objection that the petition was filed in good faith, Respondent argues that "[P]etitioners' claim never possessed a reasonable basis." *Id*. at 8. Respondent disagrees with Petitioners' arguments in support of filing the petition with a reasonable basis, noting that such "arguments are without merit." *Id*.

Regarding Z.H.'s TDC culture, Respondent notes that the "culture grew non-typeable beta lactamase-producing light *H. influenzae*, not *H. influenzae* type b." *Id*. Respondent also references the URMC Health Encyclopedia (Resp't's Ex. A), as initially discussed in his Rule 4(c) Report, emphasizing that "thyroglossal duct cysts are present at birth, usually not found until at least two years of age, and often associated with URIs—precisely what happened in this case." *Id*. Respondent further states that "Petitioners cite no support for the assertion that 'medical literature supports a correlation between infected thyroglossal duct cyst and *[H]. influenza*,' nor have they filed any such medical literature." *Id*. (citing Fees App. at 3).

Regarding Z.H.'s treating physicians, Respondent notes that while such physicians acknowledged that Z.H. received a Hib vaccine, "none of them suggested that the vaccine could or did cause his cyst." *Id*. Z.H.'s treating physicians "noted that Z.H.'s risk factors included a URI," and "that [Z.H.] had been intermittently sick for three weeks prior to the vaccination and had URI symptoms for at least five days prior to the vaccination, and that both his siblings also had cold symptoms and fevers." *Id*. Respondent also raises the argument that Petitioners' counsel "had ample time to investigate the reasonable basis for the petition prior to its filing" and that counsel was able to review the case in its entirety, "including contacting experts[,]" before the case was barred by the statute of limitations. *Id*. at 9.

Petitioners replied to Respondent's Response on August 30, 2017, addressing the arguments raised by Respondent. Pet'r's Reply. Regarding the medical literature cited by Respondent, which notes the correlation between pre-existing TDC and URI, Petitioners point out that Z.H.'s prior URIs did not result in an infected TDC; Petitioners contend that the absence of an infected TDC with these previous URIs indicates Z.H.'s URI in late April/early May 2014 did not cause his symptoms. *Id*. at 2.

Petitioners also referred to medical literature that they claim shows a "causal relationship between infected thyroglossal duct cyst and *h. influenza*[.]" *Id*. at 3. The medical literature is titled *Skin and soft tissue infections caused by Haemophilus influenzae type b over a 30 year period*. *See* Pet'r's Ex. A. Petitioners also cite medical records that show Z.H.'s TDC culture grew beta-lactamase h. influenzae.[7] *See* Ex. 4 at 25 ("culture grew beta-lactamase H. Flu"). Further, Petitioners state that the "Hib vaccine is given to prevent infections caused by *h. influenzae*, and with temporal association between vaccination and infected cyst noted in Z.H.'s record[,] it is not unreasonable to find it feasible for the Hib vaccine to have played a significant role in the onset of Z.H.'s infected cyst." Pet'r's Reply at 3.

## V.     Applicable Law

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is mandatory where a Petitioner is awarded compensation; where compensation is denied, as it was in this case, the special master must first determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Human Servs.*, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such requirement is a "subjective standard that focuses upon whether [a] petitioner honestly believed he [or she] had a legitimate claim for compensation." *Turner v. Sec'y of Health & Human Servs.*, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioners had an honest belief that their claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Human Servs.*,

---

[7] Z.H.'s culture results are also located at Ex. 2 at 51.

2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

Regarding the reasonable basis requirement, it is incumbent on Petitioners to "affirmatively demonstrate a reasonable basis," which is an objective inquiry. *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 305 (2011); *Di Roma*, 1993 WL 496981, at *1. When determining if a reasonable basis exists, many special masters and U.S. Court of Federal Claims judges employ a totality of the circumstances test.[8] The factors to be considered under this test may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, No. 17-36V, 2018 WL 3032395, at *7 (Fed. Cl. June 4, 2018). This "totality of the circumstances" approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Human Servs.*, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *See Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017). Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa*, 2018 WL 3032395, at *7.

Unlike the good faith inquiry, reasonable basis requires more than just Petitioners' belief in their claim. *See Turner*, 2007 WL 4410030, at *6. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Human Servs.*, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015). The court expects the attorney to make a pre-filing inquiry into the claim to ensure that it has a reasonable basis. *See Turner*, 2007 WL 4410030, at *6-7. However, "special masters have historically been quite generous in finding reasonable basis for petitions." *Turpin v. Sec'y of Health & Human Servs.*, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005); *see Turner*, 2007 WL 4410030, at *6-7. For instance, special masters have been more lenient if the petition was originally filed *pro se*. *See Turner*, 2007 WL 4410030, at *6. In such situations, the bar for establishing reasonable basis can be lowered. Allowances have also been made for "skeletal" petitions, where reasonable basis is later reinforced with medical records and expert opinions. *Turpin*, 2005 WL 1026714, at *2.

However, even if reasonable basis exists at the time the petition is filed, it "may later come into question if new evidence becomes available or the lack of supporting evidence becomes

---

[8] Multiple Judges at the U.S. Court of Federal Claims have affirmed instances when the special master employed this test or remanded a decision when the special master did not. *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 288 (2014); *Graham v. Sec'y of Health & Human Servs.*, 124 Fed. Cl. 574, 579 (2015); *Rehn v. Sec'y of Health & Human Servs.*, 126 Fed. Cl. 86, 91-92 (2016); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 726 (2016); *Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 574 (2017).

apparent." *Chuisano*, 116 Fed. Cl. at 288; *see also Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994) (affirming the special master's finding that reasonable basis existed until the evidentiary hearing); *Hamrick*, 2007 WL 4793152, at *4 (observing that "Petitioner's counsel must review periodically the evidence supporting [P]etitioner's claim").

## VI.    Analysis

### A.  Good Faith

Petitioners are entitled to a presumption of good faith, and Respondent does not contest that the petition was filed in good faith. *Grice*, 36 Fed. Cl. at 121. There is no evidence that this petition was brought in bad faith. Thus, I find that the good faith requirement is satisfied.

### B.  Reasonable Basis for Filing the Petition

The reasonable basis standard is objective and requires Petitioners to submit some evidence in support of the petition. Petitioners raise the following points in support of a reasonable basis for filing the petition: (1) Z.H. never suffered a TDC following prior URIs; (2) medical literature; (3) Z.H.'s culture results; and (4) the temporal association between the Hib vaccine and the onset of Z.H.'s TDC symptoms. Pet'r's Reply at 2-3. As discussed in more detail below, I find Petitioners' arguments regarding points (3) and (4) to be persuasive.

#### 1.  Z.H.'s Prior URIs

In support of a reasonable basis for filing their claim, Petitioners state that despite Z.H.'s prior URIs and pre-existing congenital TDC, "Z.H. had no history of infected thryoglossal duct cyst and/or other resulting URI sequela." Fees App. at 2. Petitioners reason that "if thyroglossal duct cysts are a known pre-existing congenital condition which often times manifest itself in conjunction with URI, then…Z.H.'s pre-existing congenital [TDC] would have manifested during a prior URI episode." Pet'r's Reply at 2. I do not find this argument to be compelling.

First, the excerpt filed by Respondent from the URMC Health Encyclopedia notes that "[a]lthough the cyst is present at birth, it is usually not found until a child is at least age 2." Resp't's Ex. A at 1. Z.H.'s prior URIs occurred before he was two years old. Z.H. had a URI on October 11, 2012 at the age of 11 months (Ex. 2 at 18), and on June 25, 2013, at the age of one year and eight months. Ex. 2 at 4. Thus it stands to reason that he did not develop an infected TDC after his other prior URIs.

Additionally, because the infection of a pre-existing TDC is often triggered by a URI does not mean that a URI always triggers a TDC infection. The Vaccine Program is replete with petitioners who have received a vaccine (for example the flu vaccine) over the course of their lives, but have never experienced an adverse response, until the one time that they do. Similarly, there are many examples in the Vaccine Program where URIs cause some type of injury (for example, GBS, ITP, and others); these same petitioners have experienced many prior URIs that do not lead

to GBS or ITP.  The fact that prior URIs did not result in Z.H.'s TDC does not establish a reasonable basis for the petition in this case.

### 2.  Medical Literature

Petitioners filed an abstract of medical literature (Pet'r's Ex. A), entitled *Skin and soft tissue infections caused by Haemophilus influenza type b over a 30 year period*.  It is unclear whether Petitioners considered this article in support of filing the petition, as it was filed on August 30, 2017.  Because Petitioners' counsel billed for time expended researching medical literature prior to filing the petition, and because they now supply this abstract as the sole piece of medical literature in support of their claim, I will consider it in my analysis.

The only relevant portion of this one page abstract notes that three new patients were added to the study after 1997, when the Hib vaccine was universally administered.  Of these three new patients, two of them were children with an infected TDC and the third presented with cellulitis of the leg.  "Of these children, one had received only the three primary doses of the vaccine but not the booster dose, and the remaining two were unvaccinated immigrant children."  Pet'r's Ex. A.

Petitioners allege that Z.H. developed a TDC which was caused in fact by the Hib vaccine.  As discussed earlier, a TDC "is formed from leftover tissue from the development of the thyroid gland when the embryo was forming."[9]  The abstract filed by Petitioners does not stand for the proposition that the Hib infection or vaccine can actually cause a TDC.  Further, there is simply not enough information to conclude that there is a connection between Hib and/or the Hib vaccine and infection of a pre-existing TDC.  Specifically, there is no way for me to ascertain whether the one vaccinated child referenced in the study presented with an infected TDC or with cellulitis.  Petitioners did not file the full text of the article, and further this full text version is in Spanish.  As it stands, this one page abstract does not advance Petitioners' claim, and does not establish that it possessed a reasonable basis at the time of filing.

### 3.  Z.H.'s Culture Results

On May 22, 2014, Z.H. underwent a needle aspiration of his TDC, and the culture was sent for testing.  Ex. 2 at 20-22, 27.  Z.H.'s TDC culture grew *H. influenzae*.  Ex. 4 at 25; Ex. 2 at 51.  Petitioners contend these results establish a reasonable basis for the petition because the culture tested positive for *H. influenzae* and the Hib vaccine is given to prevent infections caused by *H. influenza*e.  Fees App. at 3.

The Hib vaccine is given to prevent infections caused by *H. influenzae* type B, which is a strain of *H. influenzae*.[10]  Petitioners have articulated an objectively plausible theory; that Z.H.'s culture grew *H. influenza*e which was connected to the Hib vaccine that Z.H. received to protect

---

[9] *See* Resp't's Ex. A.

[10] *See* Centers for Disease Control and Prevention, Haemophilus influenzae Disease (Including Hib), https://www.cdc.gov/hi-disease/index.html, last accessed June 19, 2018.

against a strain of this bacteria. While ultimately this test result was not sufficient to maintain their claim, it does constitute some evidence in support of the claim. Accordingly, I find that it was reasonable for Petitioners to rely on these medical results in filing their petition.[11]

### 4. Temporal Association

The medical records in this case clearly reflect a temporal association between the Hib vaccine and changes in Z.H.'s state of health. *See* Ex. 2 at 43 (On May 2, 2014, "patient presents with swollen neck. The onset was 12 hour(s) ago"); Ex. 3 at 1 ("[Status post] vaccine, swollen neck"); Ex. 4 at 61 ("The patient presents with swollen neck. The onset was 12 hour(s) ago"). From the year 2011 to 2014, Z.H. had approximately 14 visits with his primary care physician at Pediatric Alliance, including the visit on May 1, 2014 when he received his Hib vaccine. *See generally* Ex. 2. Of these 14 visits, with the exception of October 11, 2012 and November 6, 2013 (when Z.H. had a URI), Z.H. was "doing well" and physical examination of the neck and thyroid revealed to be "supple without lymphadenopathy or enlarged thyroid." *See generally* Ex. 2.

It is also noteworthy that Z.H. was examined immediately before he received his Hib vaccine; in particular, his neck and thyroid were described as "supple without lymphadenopathy[12] or enlarged thyroid." Ex. 5 at 6. While temporal association alone does not establish reasonable basis[13], because the medical records show the onset of Z.H.'s TDC symptoms occurred quickly after receiving the Hib vaccine, it is reasonable for Petitioners to submit temporal association as *some* support of their claim.

### 5. Opinion of Treating Physicians

Although no physician directly attributed Z.H.'s infected TDC to the Hib vaccine, there are two annotations in the medical records that are favorable to Petitioner on the issue of reasonable basis. First, when Z.H. went to the Emergency Department at Passavant, the chief complaint noted in the records is "S/P [status/post] vaccine, swollen neck." Ex. 3 at 1. Additionally, the ED Assessment Form from Passavant under Focused assessment ED states, "pt had immunizations yesterday. yesterday pt was sleepy. mother states taht (sic) pt has swelling of left neck. which has aincreased (sic) after immunizations." *Id.* at 34. These two notations in the medical records

---

[11] I note that the parties did not file any further information about the lab test in this case; specifically there is no information in the record discussing the significance of the words "non-typ[e]able" and "?" printed in the margin of the medical records.

[12] Lymphadenopathy is a disease of the lymph nodes, usually with swelling. Dorland's Illustrated Medical Dictionary, 1083 (32nd ed. 2012) [hereinafter "Dorland's"].

[13] *See Chuisano*, 116 Fed. Cl. at 288 ("[r]easonable basis requires presenting more than evidence showing only that the vaccine preceded the onset of the injury for which the petitioner seeks compensation.") *citing Chuisano v. Sec'y of Health & Human Servs.*, 2011 WL 6234660, at 14 (Fed. Cl. Spec. Mstr. Oct. 25, 2013).

go beyond simply recounting a history from the Petitioners.[14]   In fact, the statement "patient had immunizations yesterday" is annotated as an assessment from the treating medical staff.   The provider who made this annotation found the fact that Z.H. had just received the Hib vaccine to be significant enough to include it in the medical records.   Accordingly, I find that these annotations constitute some evidence supporting a reasonable basis to file the petition.

The record establishes that Z.H. received a Hib vaccine, he developed an infected TDC within 12 hours of vaccination, his TDC culture tested positive for *H. influenzae*, and two providers mention Z.H.'s Hib immunization in relation to his symptoms.   Because there is some support for Petitioners' claim in the medical records, I conclude that a reasonable basis existed when Petitioners filed their claim on December 16, 2015.

### C.  Whether Reasonable Basis Existed for Maintaining the Petition

While petitioners had reasonable basis to file their petition, I conclude that reasonable basis ceased to exist on October 28, 2016, when Dr. Post informed Petitioners' counsel that he was unable to serve as an expert.  Dr. Post wrote:

> I have conducted an independent medical review as to the causal connection between the subject vaccine and injury. Additionally, I have conducted an in-depth review of the available medical literature. Unfortunately, I can find no support for a cause and effect relationship, nor can I generate a cohesive medical theory as to why a HiB vaccine would cause an infection of a pre-existing thyroglossal duct cyst.

Ex. 6 at 1.  It was at this point where Petitioners' subsequent efforts to seek an expert to support their claim became unreasonable.

Petitioners sought the help of three experts[15] prior to receiving notice of Dr. Post's inability to support causation in this case.  Counsel continued to search for an expert in this case, even after receiving Dr. Post's letter regarding causation.  Counsel spent approximately 11.2 hours seeking an expert, filing status reports regarding his search for an expert report, reviewing scheduling orders which granted additional time to seek an expert, and researching medical literature.  While counsel exhibited a good faith effort to obtain support for his clients' claim, it was unreasonable for counsel to continue to search for support after receiving notice that Dr. Post, as well as two other experts, were unable to supply an opinion in support of Petitioners' claim.  Further, the initial medical research conducted by counsel for 3.8 hours was reasonable, however, the additional 4.5 hours for medical research, despite Dr. Post's "in-depth review of the available medical literature[,]" (Ex. 6 at 1) was unreasonable.  Dr. Post, to whom counsel reached out as an expert in

---

[14] The statement "pt had immunizations yesterday" does not appear to be simply a recitation of the history provided by Z.H.'s mother.  This first portion of the annotation stands in contrast to the end of the note, which begins, "mother states [that]…".

[15] Mr. Golvash reached out to Dr. Maguire (Fees App., Ex. A at 3), Dr. Hillman (*id*.), and Dr. Hilal (*id*. at 4) prior to contacting Dr. Post.

this case, conducted a thorough review of medical literature and was unable to find support for Petitioners' claim—counsel should have been aware that his additional efforts would be similarly unsuccessful.

Considering the medical records and the totality of the circumstances, I find that a reasonable basis did exist for the petition and existed until October 28, 2016, when Dr. Post, who reviewed the medical records and conducted an in depth review of medical literature, informed Petitioners' counsel of his inability to support Petitioners' claim.

### D.  Reasonable Attorneys' Fees

The Federal Circuit has approved the use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008).  Under the lodestar approach, the Court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  *Id.* at 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)).  The Court may then make an upward or downward departure from the initial calculation based on other specific findings.  *Id.* at 1348.  Special masters may adjust a fee request *sua sponte*, apart from objections raised by respondent and without providing petitioners with notice and opportunity to respond.  *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (Fed. Cl. 2009).  Special masters need not engage in a line-by-line analysis of a petitioner's fee application when reducing fees.  *See Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (Fed. Cl. 2011).

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation."  *Avera*, 515 F.3d at 1348.  Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary."  *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley* v. *Eckerhart*, 461 U.S. 424, 434 (1983)).  "Unreasonably duplicative or excessive billing" include "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries."  *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016).  Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done."  *Saxton*, 3 F.3d at 1522.

### 1.  Hourly Rates

Petitioners request an hourly rate of $300.00 per hour for work performed by Mr. Golvash from 2014 to 2017.  *See generally* Fees App., Ex. A.  Petitioners also request an hourly rate of $135.00 for work performed by a legal assistant in 2014 and 2016.  *Id.*  I find that the hourly rates proposed by Petitioners for Petitioners' counsel and legal assistant are reasonable.[16]

---

[16] Petitioners' application for fees and costs relies upon a proposed hourly rate for Petitioners' counsel, Mr. Jeffrey Golvash, who practices in Pittsburgh, Pennsylvania.  Although I find the proposed hourly rate to be reasonable, I do

## 2.  Time Expended

Although I find that this case possessed a reasonable basis thereby entitling Petitioners to a fees and costs award, time devoted to the matter after October 28, 2016 should not be compensated.  Accordingly, I award attorneys' fees in the amount of $12,787.50 for work performed on the matter from September 8, 2014 to October 28, 2016.[17]

On May 22, 2017, Mr. Golvash began his preparation to exit the Vaccine Program.  Fees App., Ex. A at 6.  He billed 5.8 hours for drafting a motion to dismiss, drafting a joint notice not to seek review, drafting an election to file a civil motion, and drafting the present motion for attorneys' fees and costs.  *Id.*  "If a case began with reasonable basis, it is fair to permit counsel (who acted reasonably in bringing the action) an opportunity to close the case out—and receive fees associated with such actions."  *Curran v. Sec'y of Heath & Human Servs.*, No. 15-804V, 2017 WL 1718791, at *3 (Fed. Cl. Spec. Mstr. Mar. 24, 2017).  I will also award attorneys' fees in the amount of $1,740.00 for work by Petitioners' counsel to terminate this case.[18]

I therefore award a total of $14,527.50 in attorneys' fees.

### E.  Costs

Like attorneys' fees, a request for reimbursement of costs must be reasonable.  *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (Fed. Cl. 1992).  Petitioners request a total of $3,574.84 in attorneys' costs.  Fees App., Ex. A at 7.  I reviewed the costs submitted with Petitioners' request.  I find costs incurred from September 2014 to September 2016 in the amount of $1,114.84, to be reasonable as it reflects expenses for obtaining medical records, postage, court filing fee, and copying.  I will not award the cost of $60.00 for "GSS Health Sciences Library; Medical Records" as such cost was incurred on May 9, 2017—after Petitioners no longer had a reasonable basis for their claim.  Further, for the reasons set forth below, I find it appropriate to reduce the amount of costs for Dr. James Christopher Post's expert fee.

### 1.  Expert Costs: Dr. Post

"Expert fees are generally determined by multiplying a reasonable hourly rate by a reasonable number of hours."  *Turkupolis v. Sec'y of Health & Human Servs.*, No. 10-351V, 2015 WL 393343, at *7 (Fed. Cl. Spec. Mstr. Jan. 9, 2015).  "When determining a reasonable hourly rate, an expert's professional qualifications and experience testifying in the program can be considered."  *Chynoweth v. Sec'y of Health & Human Servs.*, No. 13-721V, 2017 WL 6892900, at *3 (Fed. Cl. Spec. Mstr. Oct. 30, 2017) (citing *Wilcox v. Sec'y of Health & Human Servs.*, No. 90-

---

not, however, reach the question of whether Mr. Golvash is entitled to the forum rate under the test established by the Federal Circuit in *Avera*, 515 F.3d at 1349.  This decision does not constitute such a determination.

[17] Mr. Golvash worked a total of 59.7 hours in this case.  Fees App., Ex. A at 7.  Between September 8, 2014 and October 28, 2016, he worked 41.5 hours at an hourly rate of $300.00 and his legal assistant worked 2.5 hours at an hourly rate of $135.00 (fee total of $12,787.50).

[18] Mr. Golvash worked a total of 5.8 hours to wind-down this case at an hourly rate of $300.00 (totaling $1,740.00).

991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997); *Simon v. Sec'y of Health & Human Servs.*, No. 05-941V, 2008 WL 6238333, at *7 (Fed. Cl. Spec. Mstr. Feb. 21, 2008)).

Petitioners' request $2,400.00 for a fee paid to Dr. Post by their counsel.  The request is supported by a letter from Dr. Post, detailing the number of hours expended to review Petitioners' record and medical literature.  Ex. 6.  According to the letter, Dr. Post worked for four hours at a rate of $600.00 per hour.  *Id.*  I have found no other instances in which a special master determined the proper hourly rate for Dr. Post.

Dr. Post's hourly rate is higher than what experts typically receive in the Vaccine Program. *See Rosof v. Sec'y of Health & Human Servs.*, No. 14-766V, 2017 WL 1649802, at *4 (Fed. Cl. Spec. Mstr. Mar. 31, 2017) (noting that awarding $500 per hour for an expert in the Vaccine Program is rare).  Further, Petitioners provided no support to justify that an hourly rate of $600.00 is reasonable.  Without information regarding Dr. Post's credentials and experience, Petitioners have made it difficult to evaluate the reasonableness of Dr. Post's hourly rate.

In light of Dr. Post's inexperience as an expert in the Vaccine Program coupled with the fact that Petitioners provided no support to justify an hourly rate of $600.00, I find that an hourly rate of $400.00 is reasonable.  I do not find that four hours is an excessive amount of time to review Petitioners' records.  I therefore award $1,600.00 in expert costs.

Petitioners are awarded a total of $2,714.84 in costs.

**VII.    Conclusion**

Based on the foregoing, I **GRANT IN PART** Petitioners' Motion for Attorneys' Fees and Costs.  I award **$17,242.34**,[19] representing $14,527.50 in attorneys' fees and $2,714.84 in costs, in the form of a check payable jointly to Petitioners, John and Rachel Homick, and Petitioners' counsel, Mr. Jeffrey Golvash, Esq. of Brennan Robins & Daley, P.C.  The clerk shall enter judgment accordingly.[20]

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master

---

[19] This amount is intended to cover all legal expenses incurred in this matter.  This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered.  Furthermore, § 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein.  *See Beck* v. *Sec'y of Health & Human Servs.*, 924 F.2d 1029 (Fed. Cir. 1991).

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.